Martha VON BULOW, by her next
friends Alexander AUERSPERG and
Annie Laurie Auersperg Kneissl, and
Alexander Auersperg and Annie Laurie
Auersperg Kneissl, individually, Plain-
tiffs,

v.

Claus VON BULOW, Defendant.

No. 85 Civ. 553 (JMW).

United States District Court,
S.D. New York.

May 5, 1986.
On Motion for Limited Reargument
July 1, 1986.

**1290**

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for plaintiffs; Michael F. Armstrong, Frederic W. Parnon, Susan Gotbetter, David J. Nathan, Carol Quackenbos, of counsel.

Schulte, Roth & Zabel, New York City, for defendant; John S. Martin, Jr., Stacey J. Moritz, Beryl A. Howell, Jonathan Barzilay, of counsel.

## OPINION

WALKER, District Judge:

### I. *Introduction*

Defendant Claus von Bulow moves pursuant to Fed.R.Civ.P. 9(b), 12(b)(1), (6), and (7), and 19(b) for dismissal of this action. For the reasons stated below, the Court denies the motion in its entirety with one exception.

This action is brought by the two children of Martha von Bulow's earlier marriage suing on her behalf as her "next friends." They allege that defendant devised a scheme to murder their mother, a woman of substantial wealth, and twice attempted to carry out his plan through the surreptitious injection of drugs. His aim, they contend, was to gain a multimillion dollar inheritance from Mrs. von Bulow's estate and attain the freedom to marry another woman. In the case of the second attempt, they allege he also sought to ensure continued receipt of payments from an *inter vivos* trust established by Mrs. von Bulow following her recovery from the first attempt. Mrs. von Bulow today remains in a permanent coma, which is the result, plaintiffs allege, of defendant's second murder attempt.

On July 20, 1984, the Supreme Court of the State of New York, acting pursuant to N.Y. Mental Hygiene Law § 78.01 (McKinney 1985), adjudicated Mrs. von Bulow an incompetent and appointed a committee consisting of Chemical Bank and attorney C. Sims Farr, ("the committee"), to administer her non-trust assets.

Under various legal theories in ten claims, plaintiffs seek to deny Claus von Bulow all material gain, past, present, and future, derived from his alleged misdeeds. The complaint was filed on July 19, 1985, one day less than a year following the appointment of the committee and less than two months after a Rhode Island jury acquitted defendant in his second trial of two counts of assault with intent to murder his wife. The first Rhode Island criminal trial resulted in a conviction on the same criminal charges but was reversed on appeal.

In his motion, defendant asserts that (1) plaintiffs lack standing to bring the action as Martha von Bulow's "next friends"; (2) six of the ten claims are time-barred; (3) the RICO claims are insufficiently alleged; (4) indispensable parties, citizens of New York, must be joined as defendants, thereby destroying diversity; (5) the common law fraud allegation does not state a claim and lacks particularity; and (6) the Court is without authority or jurisdiction to deny defendant support and maintenance from the assets of his comatose wife. The consideration and resolution of these motions require a somewhat detailed exposition of the allegations in the complaint.

## II. *The Complaint*

### A. *The Alleged Scheme*

The complaint alleges the following unhappy series of facts as the basis for its claims:

Defendant married Martha von Bulow in 1966 and was completely supported by her. He concealed from her various extra-marital affairs, including one with a woman with whom he discussed marriage in 1979 and who gave him until January 1980 to leave his wife. He helped prepare his wife's will, which she executed on December 12, 1979, and was aware that it left him tangible personal property worth approximately $4,000,000; an outright share of the testamentary estate valued at approximately $2,500,000; and income for life from a trust valued at $7,500,000, with the power to dispose of the principal at his death. The will also named him trustee of various trusts including a charitable instrument under which defendant could control the distribution of income amounting in 1979 to approximately $1,000,000 per year for 21 years.

During the night of December 26–27, 1979, defendant attempted to murder his wife by surrepetitiously injecting her with insulin and other drugs. He caused her to lapse into a coma, did nothing to help her, and tried to conceal her condition from those who would assist her. Finally, her condition became apparent to others who demanded that a doctor be summoned.

Mrs. von Bulow survived, and defendant lied to her doctors and family about his knowledge of and responsibility for her condition by creating the false impression that alcoholism caused her coma. He also concealed his murder attempt from Mrs. von Bulow. As a result of these misrepresentations and concealments, Mrs. von Bulow was induced to establish a $2,000,000 charitable remainder trust giving defendant a lifetime income of $120,000 per year.

Defendant and his wife discussed divorce in late 1980. On the night of December 20–21, 1980, he again attempted to murder her by the same means, this time putting her into a permanent coma. He again lied to her doctors and family concerning his knowledge of and responsibility for her condition and tried to persuade her family to remove her from life support systems and allow her to die.

The complaint alleges diversity jurisdiction under 28 U.S.C. § 1332, federal subject matter jurisdiction under 18 U.S.C. § 1964(c), and pendent jurisdiction for the state law claims.

### B. *Theories of Recovery and Relief Sought*

The complaint alleges ten claims: assault and battery for the two alleged murder

attempts (Claims I and II); negligent withholding of care on each occasion (Claims III and IV); common law fraud (Claim V); a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and a similar state claim under Rhode Island law (Claims VI and VII); unjust enrichment from the fraudulent scheme (Claim VIII); mistake resulting in the creation of the 1980 *inter vivos* trust and unjust enrichment (Claim IX); and a declaratory judgment of defendant's non-entitlement to maintenance payments pursuant to the New York Mental Hygiene Law (Claim X). Plaintiffs bring Claims I–IX as "next friends" of Mrs. von Bulow. They bring Claim X both individually and as "next friends."

The complaint seeks relief in the form of money damages on Claims I–VII. It also asks for equitable relief as follows: a constructive trust on money and property wrongfully received; recission of the 1980 trust or, alternatively, excission of defendant's interest and acceleration of the charitable remainder; an accounting of funds wrongfully received from Mrs. von Bulow and restitution (Claims VIII and IX); and a judgment barring defendant from receipt of safekeeping, support, or maintenance from Mrs. von Bulow or her committee (Claim X).

### III. *Discussion*

#### A. *Plaintiffs' Capacity to Sue as "Next Friends"*

 Defendant challenges the capacity of plaintiffs to bring their ten claims against him as the "next friends" of Martha von Bulow.[1] He argues that under New York law the existence of a court-appointed committee, administering her non-trust assets, precludes a suit on her behalf by her children from a previous marriage. He contends that they may not bring the action as "next friends" without demonstrating a conflict of interest between the committee and the incompetent. Defendant argues further that the committee's

decision not to bring this action after being requested to do so by plaintiffs, conclusively precludes plaintiffs' right to sue as "next friends."

This Court's analysis begins with Fed.R. Civ.P. 17(c) which states:

(c) *Infants or Incompetent Persons.*

Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representaive may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

Rule 17(c) is permissive, not mandatory. It gives the Court power to authorize someone other than a committee to sue on behalf of an incompetent where the committee is unable or refuses to act *or* its interests conflict with those of the incompetent. 6 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1570; 3A J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 17.26 (2d ed. 1985). Professor Moore states:

Under the second sentence of subdivision (c) an infant or incompetent person who does not have a duly appointed representative, may sue by his next friend or by a guardian *ad litem.* Even though the infant or incompetent has a general representative, if the representative is unable or refuses to act or his interests conflict with the person represented, the infant or incompetent may sue in federal court by his next friend or by a guardian *ad litem.* Courts have always had the power to appoint special representatives under such circumstances, and this pow-

---

**1.** Plaintiffs also bring Claim X in their individual capacities. Their ability to do so is discussed

at p. 23.

er should be considered retained by the federal court in Rule 17(c). The fact that the first sentence is permissive is an implicit recognition of that power; and, in any event, a guardian *ad litem* probably can be appointed in such cases under the third sentence of subdivision (c).

*Id.* at 17–275 to 276 (footnotes omitted).

The power to appoint a guardian *ad litem* notwithstanding the existence of a committee is also rooted in the history of Rule 17(c). That Rule is derived in substance from former Equity Rule 70, which authorized suit either by a guardian or by a "prochein ami," i.e., next friend, subject only to "such orders as the court ... may direct." *See* Fed.R.Civ.P. 17(c) advisory committee comment.

Both federal and New York state courts have repeatedly affirmed the power of the court to determine that the interests of a child or incompetent would best be represented not by a general representative, such as parent or guardian, but by a guardian *ad litem* or "next friend." In *Seide v. Prevost,* 536 F.Supp. 1121 (S.D.N.Y.1982), and *Child v. Beame,* 412 F.Supp. 593 (S.D.N.Y.1976), courts in this district concluded that Rule 17(c) permitted appointment of a guardian *ad litem* where parents were unable or refused to act or had abandoned interest. In *Hoffert v. General Motors Corp.,* 656 F.2d 161 (5th Cir.1981), *cert. denied sub nom. Cochrane & Bresnahan v. Smith,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982), the appearance of a conflict of interest between a minor and his general representative justified the appointment of a guardian *ad litem.* *See also Adelman v. Graves,* 747 F.2d 986 (5th Cir.1983); *Noe v. True,* 507 F.2d 9 (6th Cir.1974) (where the interests of a child and her legal guardian were adverse, the child was "not otherwise represented" as stated in Rule 17(c) and thus appointment of a guardian *ad litem* was appropriate); *cf. Developmental Disabilities Advocacy Center, Inc. v. Melton,* 689 F.2d 281 (1st Cir.1982) (suit by a "next friend" not allowed where there was no discernible conflict in the general representative and the

general representative opposed the suit as not being in the incompetent's best interest).

■ The New York rule is the same in substance as the federal rule. N.Y.Civ. Prac.Law & R. ("CPLR") § 1201 (McKinney supp.1986), like Fed.R.Civ.P. 17(c), authorizes courts to exercise broad discretion to direct representation of an incompetent by a guardian *ad litem* rather than by the committee of his property "because of a conflict of interest or for other cause." While CPLR § 1201 does not mention "next friend" representation, there is no substantial difference between a "guardian *ad litem*" and a "next friend." Historically, the "next friend" has represented the incompetent as plaintiff, the guardian *ad litem* as defendant. But, as Professor Moore has observed, despite any difference in terminology, "the functions of the two are precisely the same" 3A *Moore's Federal Practice* ¶ 17.26, at 17–281; *see also* 6 Wright and Miller, *Federal Practice & Procedure: Civil* § 1572.

■ Even prior to the enactment of CPLR § 1201 in 1962, New York law permitted courts to appoint a special representative in appropriate circumstances, notwithstanding the existence of a committee. *Sengstack v. Sengstack,* 4 N.Y.2d 502, 151 N.E.2d 887, 176 N.Y.S.2d 337 (1958); *Moore v. Flagg,* 137 A.D. 338, 122 N.Y.S. 174 (App.Div.1910). Since the enactment of CPLR § 1201, New York law is settled that an adjudicated incompetent can be represented by a guardian *ad litem* because of a "conflict of interest or for other cause." *In re Becan,* 26 A.D.2d 44, 270 N.Y.S.2d 923 (App.Div.1966). *Berman v. Grossman,* 24 A.D.2d 432, 260 N.Y.S.2d 736 (App.Div.1965);

Thus, the New York and federal rules are in harmony. As under Fed.R.Civ.P. 17(c), the appointment of a "next friend" or guardian *ad litem* in New York is not confined to situations where there is a conflict of interest between the committee and the incompetent. The term "for other cause" in CPLR § 1201 also encompasses

circumstances where the committee is unable or refuses to act.

 The instant case is not one in which the committee opposes the action as against the interests of the incompetent, as was the situation in *Developmental Disabilities Advocacy Center.* To the contrary, the committee here, when requested by plaintiffs to bring this action and informed that if it did not sue they would sue as "next friends," concluded that it was in Mrs. von Bulow's best interest for the plaintiffs to sue as "next friends." The committee had three options: bring the suit, oppose the suit, or allow plaintiffs to bring the suit as "next friends." It chose the last as consonant with its duty to preserve Mrs. von Bulow's estate. It reasoned that the legal expenses of a committee suit would likely deplete Mrs. von Bulow's assets since, in its view, the collectability of any judgment against defendant would be problematical, while any unrecovered costs of the "next friend" suit would be borne by plaintiffs themselves. On the other hand, the committee reasoned, its charge could only benefit from a suit subsidized by plaintiffs.

Defendant's argument that the committee arrived at a "considered decision that prosecution of this action was not in the best interests of their charge"[2] is groundless. This is not a case where the committee has opposed the action. The committee expressly concluded that the action brought by plaintiffs as "next friends" could only redound to the benefit of the assets held by the committee. The committee has affirmatively and repeatedly taken a position in support of plaintiffs' suit as consistent with Mrs. von Bulow's best interest and has expressed that position in two separate letters.

Defendant also attacks the standing of plaintiffs as "next friends" on the ground that duplicative litigation might follow if the committee is not a party here. At oral argument, defendant's counsel stated: "If the committee comes in and says, 'We are willing to be bound by this action as if we were the parties, and to be bound by that for all of its collateral estoppel and *res judicata* in the state courts of New York,' we would be in a much different position."[3] Following oral argument, the committee did precisely what defendant requested. While it already appeared that Mrs. von Bulow and her committee, having approved the suit, would be legally bound by the outcome of this litigation, the committee has made that result explicit in its letter of March 25, 1986:

> When we concluded after careful consideration, that it was appropriate for Mrs. Kneissel and Mr. Auersperg to bring this suit as "next friends," it was our understanding that they as plaintiffs would direct the litigation or settlement of the action on behalf of Mrs. von Bulow and that Mrs. von Bulow would be bound by the outcome of the litigation or by any settlement of the action. This is still our understanding and we agree that Mrs. von Bulow should be so bound. Of course, the Committee, in its capacity as such, would as a matter of law also be bound by any such judgment or settlement. However, to foreclose any possible dispute, the Committee expresses in this letter its explicit agreement and consent that any judgment or settlement in this action that would be binding on Mrs. von Bulow would be similarly binding on the Committee, as her representative.

Letter from Committee to Michael Armstrong at 1 (Mar. 25, 1986). Under these circumstances, where the committee has declined to sue but endorses the "next friends" action and agrees to be bound by the judgment, this Court orders, pursuant to Fed.R.Civ.P. 17(c), that plaintiffs may bring this action in a representative capacity

 There is also a separate and independent ground for plaintiffs' standing as "next friends." The committee consists of attorney C. Sims Farr, a partner with

---

**2.** Def.Mem. at 7.

**3.** Transcript of Oral Argument at 54.

White & Case in New York, and Chemical Bank, both of whom have managed Martha von Bulow's finances and counseled her "for decades." *Matter of von Bulow,* 63 N.Y.2d 221, 224, 470 N.E.2d 866, 867, 481 N.Y.S.2d 67, 68 (1984) (per curiam). The committee is a fiduciary and owes its ward no less a duty of loyalty, diligence, and prudence than an attorney owes to his client. *Compare Model Rules of Professional Conduct* Rule 1.7 (1983); *Model Code of Professional Responsibility* Canon 5 (1980). Here, conflicts exist which cast serious doubt on the committee's ability to bring this action *and* at the same time fulfill its duty.

White & Case prepared her 1969 and 1979 wills, the 1980 *inter vivos* trust for defendant's benefit at issue here, and the defendant's 1981 will. The instant suit, among other things, attacks the 1980 trust. It would be difficult, if not impossible, for Mr. Farr, who is a likely witness, to bring the action against the trust he created.

In addition, Chemical would be attacking a trust from which it derives fees. Further, defendant, Mr. Farr, and Chemical are all executors or trustees under the 1979 will of Martha von Bulow. If Mr. Farr and Chemical were unsuccessful in their suit against the defendant, they would then be placed in the difficult position of having to act jointly with their former adversary in administering the estate and testamentary trust.

Moreover, Mr. Farr drafted defendant's 1981 will and presumably received privileged communications from him regarding his finances, his expectations as his wife's heir, and other matters. Mr. Farr would be in a difficult position bringing a suit in a representative capacity against a client for whom he worked only two months after the alleged second murder attempt and who may have revealed to him confidential information bearing on the period involved in this lawsuit. In addition, if Mr. Farr were to bring this action, he would be acting contrary to defendant's legatee and trust interests he helped create.

These conflicts persist even though Mr. Farr would not be litigating this action himself. As a "client" responsible for financing the suit, he would at very least be deciding how to allocate resources, whether to settle the case and on what terms. Thus, there remains the distinct possibility that a case brought against Mr. von Bulow by a committee that includes Mr. Farr would not be pursued as vigorously as Mrs. von Bulow's interests could require.

Defendant maintains that the committee is not conflicted because any conflict is between the committee and defendant, not the committee and Mrs. von Bulow—the conflict that matters. This argument overlooks the fact that the relationship between the committee and defendant inevitably creates a conflict between the committee and Mrs. von Bulow since the committee would be less inclined as plaintiff to pursue her claims against Mr. von Bulow with vigor.

Indeed, the Court suspects that the conflicted status of Mr. Farr and Chemical may have contributed to their decision to support an action by the "next friends" rather than by the committee. Defendant's further claim that there is no conflict because the committee would be serving in a representative capacity is frivolous. It is precisely the committee's ability to vigorously pursue their charge's cause of action that is at stake.

■ Defendant and his daughter, Cosima von Bulow, a nonparty, urge the Court to conduct an evidentiary hearing to consider the committee's conflicts. This Court's determination that the suit may proceed since the committee has declined to act—irrespective of any conflict—obviates the need for a hearing on that issue. Moreover, even if plaintiff's standing was not based upon the separate ground that "next friends" may sue where the committee has declined to do so, a hearing would not be required.

Ample basis exists in the present record for this Court to conclude that the committee's ties to Mr. von Bulow leave it conflicted in this matter. Defendant has asserted

no facts that, if established at a hearing, would contradict those that support this conclusion. Thus, a hearing would serve no purpose other than to delay this proceeding. The Court has already determined from incontrovertible facts that the relationship between the committee and Mr. von Bulow, and between the committee and the trust and will under attack, raises sufficient conflicts between the committee and Mrs. von Bulow to make the committee an inappropriate representative in this action.

■ This Court, however, expressly declines to relitigate the capacity of the committee to represent Mrs. von Bulow in all her affairs. That matter is within the exclusive jurisdiction of the New York State Supreme Court that appointed the committee. N.Y. Mental Hyg. Law § 78.01 (McKinney supp.1986); *People ex rel. Flagg v. Lengyel*, 19 A.D.2d 834, 244 N.Y. S.2d 519 (App.Div.1963); *In re Barnes*, 185 Misc. 215, 56 N.Y.S.2d 386 (Sup.Ct.1945). In this case, it appears that the committee *has* acted in Mrs. von Bulow's best interest by declining to proceed itself and by supporting an action by plaintiffs as next friends. The committee has, in effect, found, at no cost, a proxy to vigorously prosecute an action it supports and from which its ward can gain monetary benefit.

### B. *Tenth Claim*

#### (1) *Standing as "Next Friends"*

In the tenth claim, plaintiffs, suing both as "next friends" and individually, seek a judgment declaring defendant ineligible to receive the "safe-keeping, support and maintenance" to which he would otherwise be entitled under the New York Mental Hygiene Law (the "MHL").

■ Section 78.01 of the MHL places "jurisdiction over the custody of a person and his property if he is incompetent to manage himself or his affairs" in the Supreme Court, and the county courts outside the city of New York. That section re-quires the court to "preserve the property of a person it declares incompetent ... from waste or destruction and, out of the proceeds thereof, provide [ ] for the payment of his debts and for the safekeeping support and maintenance ... of the incompetent and his family."

Defendant argues that plaintiffs are foreclosed from bringing this claim because the MHL does not create a "right of action allowing one heir or dependent of an incompetent to sue to interfere with the property and support rights of another heir or dependent." [4] Plaintiffs, however, are not claiming a right under the statute. They are invoking the equitable jurisdiction of this Court to obtain a declaration of defendant's ineligibility, due to his alleged wrongful conduct, to receive property or funds from his incompetent wife's estate. The question does not turn on whether a remedy in favor of the incompetent or plaintiffs is provided for by the MHL but whether this Court has equitable powers to declare that defendant's misdeeds, if proven, render him ineligible to receive benefits and proceeds arising therefrom. It is clear that the Court has such powers. Those powers and plaintiffs' ability to invoke them do not depend upon the existence of a right of action under the MHL.

■ Defendant further asserts that because the non-trust property of his incompetent wife is exclusively vested in the Supreme Court, this Court is powerless to grant the relief requested in the tenth claim since "this court has no jurisdiction over the defendant's property, which is the subject matter of the tenth cause of action." [5] Defendant relies on *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939) where the Supreme Court held that beneficiaries of a trust could not maintain an action in a Pennsylvania federal district court against the trustee to account for mismanagement since the trustee had previously filed an accounting in the Court of Common Pleas which, under Pennsylvania law, was vested

---

4. Def.Mem. at 11.

5. Def.Mem. at 13.

with exclusive jurisdiction over the trust *res.* Defendant argues that since the New York Supreme Court is exclusively vested with jurisdiction over Mrs. von Bulow's non-trust property from which the committee may make payments as an agent of the court pursuant to the MHL, *Princess Lida* dictates dismissal of any claim that affects that property. He asserts that Claim X must be brought, if at all, in the New York Supreme Court.

Defendant's reliance on *Princess Lida* is misplaced. In that case, the Supreme Court made it clear that the principle allowing a court first assuming jurisdiction over property to maintain and exercise that jurisdiction to the exclusion of another court is an exception to the general rule that a state and federal court may simultaneously adjudicate the same issues. This exception "does not apply to a case in federal court based upon diversity of citizenship wherein the plaintiff seeks merely an adjudication of his right or interest as a basis of a claim against a fund in the possession of a state court." *Id.* at 467, 59 S.Ct. at 281. The longstanding rule that a federal court may adjudicate a right to a fund in the exclusive custody of a state court was articulated in *Markham v. Allen,* 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946):

> [W]hile a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court, it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court.

*Id.* at 494, 66 S.Ct. at 298 (citations omitted).

The tenth claim is within this Court's diversity jurisdiction and is *in personam.* It seeks to determine defendant's right, or more precisely his absence of a right, to receive payments by the committee from the incompetent's property. It does not purport to exercise control over that prop-

erty or to affect the committee's administration of the incompetent's assets. Unlike the situation in *Princess Lida* or *Barnes v. Brandrup,* 506 F.Supp. 396 (S.D.N.Y.1981), cited by defendant, there is no attempt here to surcharge a trustee for mismanagement of the *res.* Thus, this Court need not inquire, as Judge Sofaer did in *Barnes,* whether, since both courts purport to exercise jurisdiction over the *res,* the state court was exercising prior control with exclusivity under state law and could effectively dispose of all the issues.

■ Defendant also argues that the tenth claim should be dismissed since declaratory relief is not available "where a special statutory proceeding has been provided." *Katzenbach v. McClung,* 379 U.S. 294, 296, 85 S.Ct. 377, 379, 13 L.Ed.2d 290 (1964). He contends that an application to the committee for payment pursuant to the MHL is such a proceeding. This argument must also fail. The existence of the statutory mechanism under the MHL for *defendant* is not a "special statutory proceeding" available to *plaintiffs* to object to such payments. This is not a situation where a statute expressly provides a special avenue of relief so as to preclude declaratory judgment. *Cf. Sobell v. Attorney General of the United States,* 400 F.2d 986 (3rd Cir.) (no declaratory judgment where statutory provision existed for prisoner to challenge sentence in sentencing court), *cert. denied,* 393 U.S. 940, 89 S.Ct. 302, 21 L.Ed.2d 277 (1968); *Carolina Brown, Inc. v. Weinberger,* 365 F.Supp. 310 (D.S.C.1973) (no declaratory judgment available where statute provided that challenge to new drug was to be made before the Food and Drug Administration). In this case, where no special statutory remedy is provided for plaintiffs, a declaratory judgment is available.

Indeed, defendant himself has pointed out that the MHL is an administrative statute that does not provide a right of action to an objecting heir or dependent. Defendant correctly observes that "plaintiffs have no right of action under the Mental Hygiene Law either as 'next friends' or acting

on their own behalf." [6] This proposition contradicts defendant's claim of the availability of a "special statutory proceeding" that would foreclose a declaratory judgment. On the contrary, it supports plaintiffs' position that if relief is to be had at all, it must be by way of declaratory judgment.

Defendant's assertion that no justiciable controversy exists because defendant has not applied to the committee for payments is also without merit. The Supreme Court has articulated the test for an "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201, as follows:

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

While it is not alleged that defendant has actually applied to the committee for payment under the MHL, the complaint does allege that he has been completely dependent upon Mrs. von Bulow for his support since 1966. He has a present right to apply for payments. If he has not done so, the complaint implies, it is because he is receiving payments from her other assets, most likely the *inter vivos* trust. If these are cut off as a result of this action, his only source of funds would presumably be the MHL payments. Under these circumstances, this Court is satisfied that, given the complaint's allegations, there is a "substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality." *Id.*

**(2)** *Standing as individuals*

Finally, defendant asserts that plaintiffs have no standing to bring the

tenth claim in their own right since there is no allegation that defendant's receipt of maintenance from the incompetent's property would affect their receipt of maintenance. He also argues that since both plaintiffs have foresworn any financial gain from this lawsuit beyond recoupment for and payment of their legal fees, they lack standing to complain of defendant's receipt of payments under the MHL. The Court agrees. While this Court recognizes the standing of plaintiffs to bring the tenth claim as "next friends," it finds no basis for their doing so in their individual capacity and dismisses the tenth claim as to plaintiffs individually. Plaintiffs may continue to prosecute the claim as "next friends" of their mother. Defendant's motion as to Claim X is denied in all other respects.

### C. *Statute of Limitations*

**(1)** *Claims I–IV*

Defendant contends that plaintiffs' first four claims, for negligence and assault, are time barred. Under New York law, which governs the limitations of these claims,[7] negligence actions are subject to a three-year limitation period (CPLR § 214(5)), and assault actions to a one-year period (CPLR § 215(3)). The events underlying these claims allegedly took place on December 26–27, 1979 and December 20–21, 1980. The action was filed on July 19, 1985. Thus, under either limitations period, these claims are time-barred absent some saving or tolling provision.

Initially, it should be noted that defendant contends the Court must apply a one year period to all of plaintiffs' first four claims. He argues that the negligence claims are indistinguishable from the assault and battery allegations and should be considered the same for statute of limitations purposes. For the reasons that follow, under either a one year period for assault and battery or a three year period for negligence, all four claims are timely.

---

**6.** Def.Mem. at 11.

**7.** *See* CPLR § 202.

■ Plaintiffs have offered two possible bases for avoiding the operation of the applicable limitations. CPLR § 215(8), added in 1983, provides:

> Whenever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action, notwithstanding that the time in which to commence such action has already expired or has less than a year remaining.

Both plaintiffs and defendant have devoted substantial effort to the question of whether this provision is retroactive and if so, to what extent. Although the statute was intended to, and does, revive causes of action that were barred before its enactment, it cannot operate to revive these claims.

The legislature clearly intended the provision to be a remedial measure, making it easier for crime victims to redress the civil wrongs they have suffered. While remedial legislation is traditionally construed broadly to effectuate its purposes, courts are constrained by the plain words of the statute which limits the relief available under CPLR § 215(8) to those who are victims of crimes prosecuted in New York.

Section 215(8) grants a toll until the "termination of a criminal action as defined in section 1.20 of the criminal procedure law." That provision defines criminal action in subparagraph (16) solely in terms of the commencement by an accusatory instrument, subsequent proceedings, and ultimate termination of such an action in a "criminal court." Under that same section in subparagraph (19), " 'criminal court' means any court defined as such by section 10.10." CPL § 10.10, in turn, defines "criminal court" in such a way as to exclude non-New York courts.

Thus, perverse though the result may seem, the language of CPLR § 215(8), as defined through this chain of provisions, does not include a Rhode Island criminal proceeding; the tolling is not available to New York victims when the crime is prosecuted out-of-state. It escapes this Court how such a limitation, based not upon the citizenship or residence of the victims or the location of the crime, but upon the irrelevant consideration of the situs of the criminal prosecution, serves the remedial purposes of the statute. Nonetheless, the Court must follow the statutory wording and leave it to the legislature to remedy the situation if it chooses. Because the criminal proceedings were not prosecuted in a New York court, CPLR § 215(8) is of no use to the plaintiffs.

■ Plaintiffs also urge that their claims are made timely by CPLR § 208, which provides in part:

> If a person entitled to commence an action is under a disability because of ... insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action is three years or more and expires no later than three years after the disability ceases, ... the time within which the action must be commenced shall be extended to three years after the disability ceases ...; if the time otherwise limited is less than three years the time shall be extended by the period of disability.

There are several levels of analysis necessary to determine whether this section operates to save any of the plaintiffs' first four claims.

First, the appointment of the committee effectively terminated the period of disability, since at that point Mrs. von Bulow could sue through her legal representative. Defendant, in fact, concedes that the committee was entitled to at least a one year period under § 208 in which to bring the claims contained in Claims I–IV.[8] Thus, the committee, after its establishment on July 20, 1984, would have had at least until

---

**8.** Def.Mem. at 22–23.

July 20, 1985 to bring these claims. Since this case was filed on July 19, 1985, there is no dispute that, if the committee were plaintiff, Claims I–IV would be timely.

Defendant then argues that the "next friends" stand in a different position than the committee because they needed no empowering legal ordination and could have brought this action at any time. Therefore, he contends, there is no basis for extending the toll of CPLR § 208 to these "next friends."

The Court disagrees. As discussed earlier, plaintiffs derive their standing from two independent and equally sufficient grounds: the position of the committee that these "next friends," and not the committee, should bring the action and the committee's conflicts. Neither of those alternative bases could exist prior to the New York Supreme Court's July 20, 1984 order declaring Mrs. von Bulow incompetent and appointing the committee.

To hold that plaintiffs should have brought their "next friends" action *before* the adjudication of incompetency and appointment of the committee would fly in the face of the policies underlying the MHL. It would also lead to duplicative litigation if the committee, once created, decided to bring the action itself or to unnecessary litigation if the committee had to bring an action in opposition to a prior "next friends" suit. Since any "next friends" action must necessarily await a decision by the committee or an analysis of the committee's conflicts, this Court holds that plaintiffs are entitled to the same limitation period as the committee.

Thus, if CPLR § 208 applies with full force, plaintiffs had at least until July 20, 1985 to bring this action—one year from the termination of legal disability by appointment of the committee. They filed this action one day before the deadline.

■ Finally, the Court must determine whether CPLR § 208 applies to toll the statute on each of the first four claims as brought. Claims II and IV, arising out of the events of December 20–21, 1980, are clearly covered by § 208 because Mrs. von Bulow was indisputably comatose from the moment of the alleged torts.

■ Claims I and III present a different issue. While the complaint alleges that the 1979 assault put Mrs. von Bulow in a coma, it recites that she recovered "in early 1980" and on March 18, 1980 was able to execute a trust for defendant's benefit. Thus, she was competent for at least nine months in 1980, although this lucid interval did not extend for a full year.

The nine month lucid interval in 1980 bars the application of CPLR § 208 to toll the statute of limitations as to Claims I and III. A period of disability must be continual from the time of an action's accrual. *Graboi v. Kibel,* 432 F.Supp. 572 (S.D.N.Y. 1977); *Jordan v. State,* 56 Misc.2d 1032, 290 N.Y.S.2d 621 (1968). Any lucid interval or break in disability precludes tolling under CPLR § 208. Thus, because Martha von Bulow was competent and theoretically could have brought Claims I and III in 1980, CPLR § 208 does not operate to toll the limitations period as to those claims.

■ Nevertheless, Claims I and III might still have been timely when filed. In *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 128, 219 N.E.2d 169, 171, 272 N.Y.S.2d 337, 340 (1966), the Court of Appeals stated:

> Our courts have long had the power, both at law and equity, to bar the assertion of affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing—a carefully concealed crime here—which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.

The complaint in this case alleges two actions by defendant that, if proved, caused Mrs. von Bulow not to bring Claims I and III in a timely fashion. First, he fraudulently concealed his 1979 murder attempt and second, he put her in an irreversible coma in late 1980. Taking these allegations as true for purposes of this motion, it appears that defendant's own wrongdoing

prevented Mrs. von Bulow from realizing she had a cause of action and bringing it.

The question of whether this equitable doctrine operates to avoid the statute of limitations defense depends upon the validity of allegations of defendant's wrongdoing. This factual may not be decided on this motion to dismiss. Defendant's motion to dismiss Claims I–IV as time-barred is denied.

### (2) *RICO and Statute of Limitations*

The defendant argues that since RICO contains no limitations period, the Court should apply the one year period of CPLR § 215(3) to the RICO claim because the predicate acts of attempted murder are similar to claims for assault and battery. Therefore, he contends, the RICO claim, like the claims for assault and battery, is time barred.

In *Durante Bros. & Sons v. Flushing National Bank,* 755 F.2d 239, 248 (2d Cir.), *cert. denied sub nom. Durante Bros. & Sons v. National Bank of New York City,* — U.S. —, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985), the court stated that "[s]ince RICO does not contain its own statute of limitations ... the court was required to apply the most appropriate limitations period provided by state law." The meaning of that statement, however, is unclear. *Durante* leaves some doubt as to whether the same limitations period must be chosen for *all* RICO claims (as with 42 U.S.C. § 1983 actions), or whether the courts should select an appropriate time period for *each* case depending upon the nature of the predicate acts.

Defendant contends that the Second Circuit did nothing more than endorse a case-by-case determination. Plaintiff urges that a uniform three year rule for all RICO actions was intended. In support of the plaintiffs' position, it should be noted that the court in *Durante* cited *Compton v. Ide,*

732 F.2d 1429 (9th Cir.1984) as authority in accord with the decision it was rendering. In that case, the Ninth Circuit seemed to declare a single uniform period applicable to all RICO actions in California, regardless of the predicate acts.

In *Fustok v. Conticommodity Services, Inc.,* 618 F.Supp. 1076 (S.D.N.Y.1985), Judge Lasker read *Durante* as limited by the nature of the predicate acts at issue: "The opinion is puzzling in that it is not clear to us whether the court intended to establish a general rule for RICO limitations periods, and in any event the opinion does not state a rule of general applicability in *haec verba.*" *Id.* at 1081. Where fraud was the basis for the RICO claim, Judge Lasker applied a six year limitations period for fraud derived from New York law. Defendant urges the Court to follow *Fustok* and in this case to apply the one year period of CPLR § 215(3) because the predicate acts of attempted murder are closely analogous to assault and battery in New York. Plaintiffs naturally argue that *Fustok* misinterprets *Durante.*

 While this Court is inclined to the view that the Second Circuit did not intend a uniform rule and to agree with Judge Lasker in *Fustok,* it need not decide the issue. Whatever period is applied, the RICO claim accrued with the second alleged attempt on December 20–21, 1980, at which time Mrs. von Bulow became comatose. Thus, this discussion of the RICO limitation period parallels that for the state law claims based on the second attempt: Any limitations period was tolled under CPLR § 208 until the appointment of the committee on July 20, 1984 and, therefore, whatever period is applied, the committee and the next friends had *at least* one year to bring the RICO action and did so.[9]

### D. *Fraud*

 Claim V of the complaint alleges that defendant fraudulently concealed ma-

---

**9.** The Rhode Island RICO statute does not contain a limitations period. Accordingly, the Court will apply the one year period applicable under CPLR § 215(3) to New York actions for assault and battery. *See* CPLR § 202; *McCarthy*

*v. Bristol Laboratories,* 86 A.D.2d 279, 449 N.Y. S.2d 280, 283 (2d Dep't 1982). The Rhode Island RICO claims are therefore timely for the reasons stated in the discussion of federal RICO claims.

terial facts from Mrs. von Bulow, inducing her to grant him a share in her wealth through the 1979 will and 1980 trust. "The elements of fraudulent concealment are: (1) a relationship between the ... parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosures; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damage." *Leasing Service Corp. v. Broetje,* 545 F.Supp. 362, 366 (S.D.N.Y. 1982) (citation omitted).

Defendant asserts that the fraud claim is in reality one for misrepresentation of marital affection, a deception not actionable as a matter of law. *Avnery v. Avnery,* 50 A.D.2d 806, 375 N.Y.S.2d 888 (1975), *appeal dismissed,* 38 N.Y.2d 997, 348 N.E.2d 915, 384 N.Y.S.2d 439 (1976). Defendant, however, misconstrues the complaint. The cases he cites concern fraud as a ground for annulment—that is, fraud going to the validity of the marital contract. Here, the existence of a valid marriage is not questioned. Plaintiffs allege defendant defrauded Martha von Bulow by concealing his intention to murder her. Certainly an implicit part of these claims is the fact that Mr. von Bulow disguised his lack of affection for his wife, but the case is based on the very different allegation that he also hid his plan to kill her.

Under New York law, the relationship between husband and wife is a fiduciary one "requiring the utmost of good faith" in dealings between them. *Christian v. Christian,* 42 N.Y.2d 63, 72, 365 N.E.2d 849, 855, 396 N.Y.S.2d 817, 823, (1977); *see also Ducas v. Guggenheimer,* 90 Misc. 191, 194–95, 153 N.Y.S. 591, 594 (Sup.Ct.), *aff'd sub nom. Ducas v. Ducas,* 173 A.D. 884, 157 N.Y.S. 801 (1915). Defendant had a duty to disclose facts material to his wife's financial decisions concerning him. And there can be no doubt that the existence of a murder scheme would have been material to Mrs. von Bulow's actions in giving Mr. von Bulow an interest in her 1979 will and 1980 trust and, once given, preserving them.

Defendant also maintains that the complaint fails to allege the necessary injury to Mrs. von Bulow as a result of the fraud. First, defendant claims that Mrs. von Bulow was not injured by the alleged fraud because the 1979 will and 1980 trust were mere financial restructurings for tax purposes and his share in his wife's bounty did not change. This is a question that demands a complicated factual analysis far beyond the scope of the pleadings. Second, defendant tries to undermine the allegation of injury by contending that the assets earmarked for him in the will and trust were only a small portion of his wife's holdings. This point appears to urge that any injury was *de minimus.* That is irrelevant; the pleading requirements for fraud demand no minimum damage claim. Plaintiffs have satisfied their obligation by alleging *any* injury. The size of that damage awaits a fact finder's determination.

### E. *Particularity of the Fraud Allegations*

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The courts have applied this rule with an eye toward its purpose. The stringent specificity requirement of 9(b) "stems not only from the desire to minimize the number of strike suits but also more particularly from the desire to protect defendants from the harm that comes to their reputations or to their good will when they are charged with serious wrongdoing." *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). "Rule 9(b) is intended to ensure that each defendant is provided with reasonable detail concerning the nature of his particular involvement in the alleged fraud." *Goldberg v. Meridor,* 81 F.R.D. 105, 110 (S.D.N. Y.1979) (citations omitted).

Even before looking closely at the complaint, it is apparent that many of the laudable concerns of Rule 9(b) are not implicated here. Mr. von Bulow has already defended himself in two highly publicized criminal proceedings based on the same

events at issue here. He surely has notice in fact of the "nature of his particular involvement in the alleged fraud." With regard to the rule's interest in protecting reputation, Mr. von Bulow, for better or worse, has occupied the public spotlight for a number of years. His prior criminal trials have made him a celebrity of sorts. In the wake of those trials, there is little this civil proceeding can do to alter his well-established public reputation.

Even if 9(b) is applied as though defendant were an obscure newcomer to litigation involving the alleged murder attempts, plaintiffs have fully complied with its requirements. The rule demands that the complaint specify:

1) precisely what statements were made in what documents or oral representations or what omissions were made, and 2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendants "obtained as a consequence of the fraud."

*Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 420–21 (S.D.N.Y.1978) (citing *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1088 (S.D.N.Y.1977), *aff'd mem.*, 636 F.2d 1201 (2d Cir.1980)).

Defendant correctly points out that a claim for fraudulent concealment is not exempt from 9(b). *Jeffrey Resources 1973 Exploration Program v. Monitor Resources Corp.*, 84 F.R.D. 609, 611 (S.D.N.Y.1979). He contends that plaintiffs have failed to detail (1) the content of the misrepresentations, (2) the time and place of the fraud, and (3) the manner in which representations were false and misleading.

█ In the process, however, defendant has misstated the law of fraudulent concealment. Because plaintiffs contend that defendant *failed to tell* his wife he planned to kill her they need not detail affirmative false statements. It is enough under 9(b) for the complaint to allege those facts that were not disclosed. *Cottman Trans-*

*mission Systems, Inc. v. Dubinsky*, 95 F.R.D. 351, 353 (E.D.Pa.1982) ("It is the *silence* or failure to act on the part of plaintiff which is complained of. Conduct which never occurred cannot be described with greater particularity other than to state that it did not occur." (emphasis in original)).

█ Here, plaintiffs have satisfied 9(b) by alleging that defendant concealed both his plan to kill his wife and his two attempts. There is nothing more to be described.

It should also be noted that the demands of 9(b) must, by necessity, be relaxed somewhat where the facts and circumstances of the alleged fraud are peculiarly within the knowledge of the defendant. This is particularly true where the culpable conduct is silence and the other party to the alleged fraud is comatose. Mrs. von Bulow is simply not able to provide all the details defendant might wish to have.

As to the time and place of the fraud, plaintiffs have provided all available details. The complaint contains the dates and locations of the alleged murder attempts and the period over which defendant concealed his alleged plans. As discussed, the nature of fraudulent concealment permits no more specificity.

Defendant also contends that plaintiffs have not detailed the manner in which his failure to disclose was false and misleading. The nature of the alleged fraud is such that the point hardly bears consideration. Implicit and obvious in the complaint is the fact that the concealment was false and misleading because, if she had known that the defendant was embarked on a plan to kill her, Mrs. von Bulow would not have created a trust and altered a will for his benefit.

█ Defendant also misstates New York law when he contends that plaintiffs have failed to allege that he had notice of Mrs. von Bulow's mistaken belief. In a case of fraudulent concealment the plaintiff must allege either a fiduciary duty between the parties *or* a duty arising out

of notice of mistaken belief. *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 283 (2d Cir.1975); *see also Jeffrey Resources, supra,* 84 F.R.D. at 610. Thus, since plaintiffs have alleged a fiduciary duty to disclose based on a marital relationship, they need not create a redundant fiduciary duty by alleging notice of mistaken belief as well.

## F. RICO

Before any discussion of defendant's motion to dismiss plaintiffs' claims under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), a brief overview of the statute is necessary. A plaintiff seeking to bring a civil RICO action must allege the following essential elements:

"(1) that the defendant [a 'person' in terms of the Act]

(2) through the commission of two or more acts

(3) constituting a 'pattern'

(4) of 'racketeering activity'

(5) directly or indirectly invests in, or maintains an interest in, or participates in

(6) an 'enterprise'

(7) the activities of which affect interstate commerce or foreign commerce."

(8) And "that the plaintiff was injured in his business or property 'by reason of' the aforementioned activity of the defendant."

*Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

In considering a RICO claim, it is important to note the Supreme Court's recent statement: "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language ... but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L. v. Imrex Co.,* — U.S. ——, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985) (citations omitted). In short, "RICO was an aggressive initiative to supplement old rem-

edies and develop new methods for fighting crime." *Id.* As the Fifth Circuit has stated, "The scope of the civil RICO statute is breathtaking.... It may be unfortunate for federal courts to be burdened with this kind of case, but it is not for this Court to question policies decided by Congress and upheld by the Supreme Court." *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985). Any analysis of a RICO claim must be guided accordingly.

Defendant claims that the complaint fails to adequately state four of the essential RICO elements: enterprise, pattern of racketeering activity, nexus between enterprise and activity, and injury. Additionally, he argues that his acquittal in Rhode Island state court bars a RICO action based on the same acts. Each point will be considered in turn.

### (1) *Enterprise*

The language of the complaint contains three alternative candidates for the required RICO enterprise. Paragraph 46 states:

Martha von Bulow, as the owner of extensive and substantial assets, including real and personal property, securities, interests in trusts, etc., by herself and as part of a group of individuals and organizations employed by her to manage and operate her assets, constituted an "enterprise" as defined in section 1961(4) of Title 18 of the United States Code. Alternatively, Martha von Bulow and defendant together constituted such an enterprise. These enterprises were engaged in interstate commerce and activities affecting interstate commerce. Defendant was associated with these enterprises at all relevant times.

Thus, plaintiffs allege as the relevant enterprise (1) Mrs. von Bulow, (2) Mrs. von Bulow together with those who "manage and operate her assets," and (3) Mr. and Mrs. von Bulow together. The complaint adequately pleads the existence of an "enterprise" under either of the first two theories but not the third.

Although defendant's briefs largely ignore the first theory, an individual may qualify as an enterprise within the meaning of 18 U.S.C. § 1961(4):

> (4) "enterprise" includes any *individual,* partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity (emphasis added).[10]

*See United States v. Elliott,* 571 F.2d 880, 898 n. 18 (5th Cir.), *cert. denied sub nom. Hawkins v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). As the Committee on RICO of the American Bar Association has noted, it is "not difficult to envision a number of instances where the individual [as an enterprise] would play the role of a 'victim.' Traditionally, sports or entertainment figures have been the focus of the attention of criminal groups.... Their 'takeover' falls within what all concede to be the core concern that lay behind the original impetus for the federal statute." American Bar Ass'n, Criminal Justice Section, RICO Cases Committee, *A Comprehensive Perspective on Civil and Criminal RICO Legislation and Litigation* [pg. 34] (1985). Thus, Mrs. von Bulow, as a wealthy individual, can be an enterprise in her own right.

The motion to dismiss focuses on the allegation that the enterprise is composed of Mrs. von Bulow together with an "association in fact" of those employed "to manage and operate her assets." Defendant first contends that this enterprise composed of Mrs. von Bulow and her employees is improper because it had no mercenary purpose. While he correctly notes that an enterprise must have a financial or economic purpose to qualify under RICO, *United States v. Ivic,* 700 F.2d 51, 60 (2d Cir.1983), the contention is without merit. In a very real sense, Mrs. von Bulow was a business. The common object of her employees was to care for her assets and increase her wealth. The fact that much of her money was held in trust does not mean that together she and her employees were not an economic venture. This same rationale also applies to an enterprise consisting solely of Mrs. von Bulow as an individual.

Defendant also argues that since the alleged attempted murders were not financial acts and the pleaded enterprises are not financial entities, the complaint does not state a claim under RICO. He relies on *United States v. Bagaric,* 706 F.2d 42 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), where the court concluded that where *"neither* the acts charged *nor* the purpose of the enterprise was economic, [the complaint] was outside the scope of § 1962(c)." *Id.* at 56 (emphasis original). The Court need not reach the financial nature of the predicte acts because, as discussed, the enterprises alleged were mercenary in nature. In any case, however, the complaint does allege that the murder attempts were motivated by the desire for a financial interest in Martha von Bulow's great wealth.

Finally, defendant contends that Mrs. von Bulow and her employees cannot be considered an "association in fact" under RICO. In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), the Court concluded that an "enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.... [It is] proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."

Defendant argues that the group composed of Mrs. von Bulow and her employees is too loosely organized to meet the test set forth in *Turkette.* As an initial matter, the question of which of Mrs. von Bulow's employees, if any, are sufficiently linked to form an "association in fact" under RICO is an inappropriate one on a motion to dismiss. Plaintiffs have adequately alleged an enterprise. Discovery may narrow or widen the circle of employees associated in fact or the fact finder may ultimately determine that there is no competent "evidence of an ongoing organization, formal or informal, and ... that the various associates function as a continuing unit."

At least one appeals court, the Fifth Circuit, has found the existence of an "associ-

---

10. The Rhode Island RICO statute, R.I.Gen. Laws § 7–15–1 *et seq.,* is identical to the federal provision with one important exception: Its definition of "enterprise" does not include the word

"individual." Accordingly, Mrs. von Bulow alone may not be a RICO enterprise under Rhode Island law.

ation in fact" to be a question of fact. *R.A.G.S. Couture, Inc., supra,* 774 F.2d at 1353 (affirming a district court decision finding "that a material question of fact exists as to whether the defendants formed an association"). Factual analysis is important because, as the Second Circuit has noted, "it is logical to characterize any associative group in terms of what it *does,* rather than by abstract analysis of its structure." *Bagaric,* 706 F.2d at 56 (emphasis original) (citations omitted). This Court need not reach the issue now; an enterprise has been adequately alleged.

 Defendant claims that the third alleged enterprise, composed of Mr. and Mrs. von Bulow, does not qualify under RICO because their marriage has no financial purpose and could not affect interstate commerce. While it appears that a marriage could have a financial dimension under RICO, the Court need not address this argument because Mr. von Bulow cannot be both the culpable "person" under RICO *and* one half of the victimized marriage "enterprise."

In *Bennett v. United States Trust Co. of New York,* 770 F.2d 308 (2d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), the Second Circuit followed the majority of circuits and held that "under 1962(c) a corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity." *Id.* at 315. In applying *Bennett,* one court in this district has correctly observed that an enterprise must be a discreet entity apart from the individual defendants who compose it. *Fustok v. Conticommodity Services, Inc.,* 618 F.Supp. 1074, 1075 (S.D.N.Y.1985). In *Fustok,* Judge Lasker upheld a RICO allegation because "the allegations as to the enterprise, i.e., the association, separate and distinguish it from the individual entrepreneurs, i.e., the named defendants." *Id.* at 1076.

In this case, where the enterprise alleged is husband and wife, and the husband is charged as the culpable person, the requisite distinction is not present. It would

stretch the elastic RICO statute too far to hold that defendant could be one half the couple-enterprise *and* the subverter of that enterprise. Accordingly, the allegation of Mr. and Mrs. von Bulow as a RICO enterprise is dismissed.

*(2) Pattern of Racketeering Activity*

 Defendant argues that the two alleged acts of attempted murder do not constitute a "pattern of racketeering activity" within the meaning of RICO. That argument is based on footnote 14 in *Sedima,* a note in the time-honored Supreme Court tradition of enigmatic footnotes. In pertinent part, footnote 14 provides:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.

105 S.Ct. at 3285 n. 14 (emphasis original).

Since the appearance of *Sedima* in July 1985, lower courts have struggled mightily to interpret this language. Defendant characterizes the Supreme Court's dictum as a "cue for the lower courts to limit the expansion of 'pattern'." [11] He relies on *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985), where the court concluded that *Sedima* intended a pattern to be "acts occurring in *different criminal episodes,* episodes that are at least somewhat separated in time and place yet still sufficiently related by purpose to demonstrate a continuity of activity." *Id.* at 832 (emphasis original). The court in *Inryco* concluded that repeated use of the mails as part of a single fraudulent scheme did not constitute a pattern.[12]

---

11. Def.Mem. at 31.

12. *Inryco* does not represent a definitive statement of the law under RICO. Several courts after *Sedima* have held that two or more mailings in the course of a single fraudulent scheme still constitute a "pattern." *See Aetna Casualty & Surety Company of Illinois v. Levy,* No. 83 Civ.

3566, slip op. (N.D.Ill. Nov. 7, 1985) [Available on WESTLAW, DCTU database] and *Trak Microcomputer Corp. v. Wearne Brothers,* 628 F.Supp. 1089 (N.D.Ill.1985); *Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494 (N.D.Ill.1985). Final resolution of this question must await further guidance from the Supreme Court.

This point does not merit lengthy discussion. Whatever the pattern requirement of RICO might mean at the margin, it surely includes two separate acts of attempted murder, committed a year apart and directed at the same "enterprise." In light of *Sedima*, and the flood of RICO mail fraud litigation, there may be good reason for excluding separate mailings incident to a single fraud from the definition of "pattern." However, that same interest simply is not implicated where the predicate acts are attempted murders.

The issue of "pattern" is injected into this case by the complaint's unfortunate organization. In the complaint, plaintiffs have captioned their factual summary "The Scheme" and allege that fraud was part of that scheme. For RICO purposes, however, the attempted murders are separate from any fraud; they were not committed in furtherance of a fraudulent scheme. In characterizing the facts of this case, plaintiffs did use the word "scheme," but the two attempted murders are as easily considered two schemes, the second made necessary as a result of the failure of the first.

As noted in the discussion of "enterprise" above, defendant claims that these predicate acts cannot be a pattern of racketeering activity because they had no financial dimension. While this is not even necessary where, as here, the enterprise itself is mercenary in nature, the alleged attempted murders were clearly for monetary gain. "The issue is whether an objective assessment of the crimes charged ... demonstrates an economic dimension sufficient to bring them within the language and intention of § 1962." *United States v. Bagaric, supra,* 706 F.2d at 53 n. 11 (2d Cir.1983). The determination to be made is "no more than an objective appraisal that *some* economic purpose was to be accomplished by the crime charged." *Id.* at 55 (emphasis added).

In *Bagaric,* the defendants in a RICO indictment were Croatian terrorists who had engaged in extortion and violent crimes in support of that extortion. In finding a financial dimension, the court distinguished *United States v. Ivic,* 700 F.2d 51 (2d Cir.1983), where another group of Croatian terrorists had committed violent acts for purely political reasons. The nature of the violent predicate acts in both cases was colored by their motive. The gravamen of the complaint here is that

defendant was out to get his wife's money and marry another woman and planned to kill in pursuit of that goal. Since the predicate acts in this case, as alleged, had as a major purpose economic gain, they qualify as a pattern of racketeering activity within the meaning of RICO.

(3) *Nexus between Activity and Enterprise*

The complaint alleges that defendant violated two sections of RICO:

(a) *§ 1962(b)*

This section of the RICO Act provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Defendant claims that plaintiffs have failed to allege any logical nexus between the activity proscribed by § 1962(b) and the target enterprise. He contends that he cannot be said to have "acquired" an interest in Mrs. von Bulow's financial enterprise as a result of the predicate acts of attempted murder. That argument ignores the complaint's language. There is no claim that defendant "acquired" an interest. Paragraph 47 alleges a violation of § 1962(b) because "through the above-described pattern of activity, defendant knowingly and willfully *maintained,* directly or indirectly, his interest in and control of the above described enterprises (emphasis added)."

There is no question, however, that § 1962(b) does require some logical connection between the predicate acts and the enterprise. The statute explicitly states that it is unlawful to maintain interest or control *through* a pattern of racketeering activity, that is, the activity must lead to the maintenance of interest or control.

Defendant argues that plaintiffs' claim under § 1962(b) rests on two false premises: first, that defendant could hold an interest in the will of a living person, and second, that his conduct could have some effect on an irrevocable charitable remainder trust.

A detailed discussion is not required because the issues here are essen-

tially factual ones and the Court declines to consider extraneous matters on a Fed.R. Civ.P. 12(b)(6). It is worth noting, however, that a testamentary expectancy is a legal interest in New York, one which may be assigned for monetary value. *See, e.g., In re Barnett,* 124 F.2d 1005 (2d Cir.1942).

In addition, the complaint does not limit its allegation under § 1962(b) to the will and trust. It could be proven—and only discovery will bear this out—that Mrs. von Bulow intended to divorce her husband and cut him off from her largesse completely. His alleged murder attempts could have maintained his interest by subjecting her first to a coma and trauma that may have effectively blocked any divorce plans and second to an irreversible coma that made divorce impossible. The fact that the 1980 trust was irrevocable does not obviate an allegation under § 1962(b). A second murder attempt could not affect this trust, but the statute does not require that the racketeering activity maintain *all* interest. It may well be shown that Mr. von Bulow had substantial non-trust interests that could be maintained.

In considering this section of the complaint as alleged, it cannot be said that "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted). Plaintiffs might well be able to prove that defendant's two murder attempts allowed him to continue to enjoy the benefits of Mrs. von Bulow's great wealth. This would be true even if a testamentary expectancy was not a cognizable interest under RICO or an irrevocable trust interest was not capable of being "maintained" under the statute.

(b) *§ 1962(c)*

18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

This subsection also requires "that there must be some nexus between the pattern of racketeering activity and the enter-

prise." *Moss v. Morgan Stanley, Inc., supra,* 719 F.2d at 21 (citation omitted). In discussing allegations under § 1962(c), the Second Circuit has said:

We think that one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).

Plaintiffs have not stated a cause of action under § 1962(c). As alleged, the complaint contains no basis for the proposition that defendant was able to "conduct or participate ... in the conduct of such enterprise's affairs...." There is no allegation that he was involved in the conduct of the enterprise's affairs. The extent of his alleged involvement is as a dependent of that enterprise. Defendant may have had an interest and maintained it by his bad acts, but there is no allegation that he helped run the enterprise.

It should be noted that the complaint, in alternatively alleging Mr. and Mrs. von Bulow together as an enterprise, theoretically contains a basis for a § 1962(c) claim. He could conceivably conduct or participate in the affairs of a marriage-enterprise. That allegation, however, is dismissed because, as discussed above, Mr. von Bulow could not be both the enterprise and the person seeking to subvert that enterprise under § 1962(b) and § 1962(c).

It would also be straining the meaning of words to argue that Mr. von Bulow was conducting or participating in the enterprise's affairs by attempting to kill his wife. He may have been trying to maintain his share of her largesse by his acts, but it can hardly be said that he was participating in the conduct of the financial entity of Mrs. von Bulow by trying to murder her. Even as broadly drafted by Congress, RICO is constrained by the plain meaning of its language.

(4) *Injury*

To state a claim under RICO, a plaintiff must allege that he was injured in

his business or property "by reason of" the racketeering activity of the defendant. *Moss,* 719 F.2d at 17. It is clear that personal injury is not actionable under RICO.

In response to plaintiffs' allegations of injury, defendant raises two points which are closely related to the nexus discussion above. First, he contends he only received a testamentary expectancy and an irrevocable trust interest, "gains" that were not causally related to the murder attempts. This argument is identical to the nexus contention and the answer is the same: it may be that the first murder attempt prevented Mrs. von Bulow from divorcing her husband and excluding him from her largesse. It could conceivably also be established that the trauma, coma, and recovery from the first attempt distorted Mrs. von Bulow's view of her husband to such an extent that she created the 1980 trust. There is no dispute that the second attempt—resulting in permanent unconsciousness—deprived Mrs. von Bulow of any opportunity to change her will, attack the trust, or otherwise disenfranchise her husband.

Second, defendant claims that there could be no injury to Mrs. von Bulow since the 1970 will and 1980 trust were merely reorganizations of Mr. von Bulow's already existing share in his wife's wealth. This contention is without merit. The effect of the 1979 and 1980 instruments is surely a complex question of fact, but even if there was *no* change in Mrs. von Bulow's financial position, it remains true that permanent unconsciousness deprives her of the ability to rearrange her affairs. Presumably, if Mrs. von Bulow knew her husband tried to kill her, she would consider altering the will's provisions to improve her financial position at defendant's expense. The inability to do so is a financial injury to Mrs. von Bulow.

Defendant, however, ignores other potential sources of injury "by reason of" the alleged RICO violations. The cost to Mrs. von Bulow of her committee and her inability to enjoy her personal and real property may well be compensable monetary injuries under RICO.

▬ It should also be noted that the complaint's failure to explain the alleged injury in detail is not fatal. Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Fed.R. Civ.P. 12(b)(6). The complaint need only "allege [ ] compensable injury flowing from the commission of the predicate acts." *Miller v. Glen & Helen Aircraft, Inc.,* 777 F.2d 496, 499 (9th Cir.1985). Viewing the complaint in the light most favorable to the plaintiffs as it must on a motion to dismiss, the Court concludes that injury has been adequately alleged. But as the court in *Miller* noted, "[p]roof, of course, presents ... considerations quite distinct from allegation." *Id.*

### (5) *State Court Acquittal*

▬ Defendant urges that his acquittal on charges of assault with intent to murder in the Rhode Island criminal proceeding bars a RICO action based on the same predicate acts. He relies on the recent decision of *United States v. Louie,* 625 F.Supp. 1327 (S.D.N.Y.1985), *appeal dismissed,* 787 F.2d 65 (2d Cir.1986), where Judge Sweet held that a federal RICO prosecution could not be based on criminal acts for which a defendant had been acquitted under state law.

While Judge Sweet's detailed opinion rested on a number of grounds, a similar analysis is not required here. This is a civil RICO action. None of the prosecutorial comity or double jeopardy concerns are present. As plaintiffs have pointed out, there is ample precedent for civil proceedings based upon alleged criminal acts, even though the defendant has been acquitted of those acts in prior criminal proceedings. *See, e.g., United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); *Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). Where a *civil* RICO action follows criminal prosecution of the predicate acts, the issue is straightforward. As another district court has noted,

[T]he plaintiffs in civil actions are not faced with the burden of proof imposed upon the government in criminal actions. The fact that the government may not have been able to prove beyond a reasonable doubt that the defendants here committed certain predicate acts does not

foreclose civil plaintiffs from proving those same predicate acts by evidence of a lesser weight than "beyond reasonable doubt."

*McCarthy v. Pacific Loan, Inc.*, 629 F.Supp. 1102, 1108 (D.Hawaii 1986) (available on WESTLAW).

 Additionally, the Court declines in this context to follow the holding in *Louie* that predicate acts are not "chargeable" within the meaning of 18 U.S.C. § 1961 if the defendant has already been acquitted in state court. Not only does that construction run against substantial precedent,[13] but it also contravenes the broad remedial purposes of RICO. And even if the statute is not to be construed broadly—as the Supreme Court has said it must—it is clear that "chargeable" means just what it says: Predicate acts are those made crimes by the laws of the states. Section 1961 does not require that they be acts that may *now* be charged to defendant under state law. The wording is generic, not specific, and such construction is consistent with the drafters' intention.[14]

### G. *Failure to Join Indispensable Parties*

 Defendant argues that since the eighth and ninth claims call for "recission of a March 18, 1980 trust created by Martha von Bulow," plaintiffs may not proceed in the absence of two "indispensable parties": the charitable remainderman, Metropolitan Opera Association ("the Met"), and the statutory representative of charitable trusts, the New York Attorney General. Defendant contends that the presence of these parties would destroy diversity since both are citizens of New York State and therefore all the state law claims based on diversity jurisdiction must be dismissed, leaving only the federal RICO allegation.

#### (1) *Fed.R.Civ.P. 19(a)*

On the contrary, while the joinder of the Met and the Attorney General *would* destroy diversity jurisdiction, it would not mandate dismissal of the state law claims. If those parties were joined, this Court could exercise pendent jurisdiction over the state law claims even though the Met and the Attorney General are not parties to the federal RICO claim which is the sole non-diversity basis for federal jurisdiction.

This "pendent party" jurisdiction "is within the discretion of the court and must depend in part upon considerations of judicial economy, convenience and fairness to litigants.... Factors that should be taken into account ... include the exclusivity of federal jurisdiction and the ability to obtain full relief in one court." *Angel Music, Inc. v. ABC Sports, Inc.*, 609 F.Supp. 764, 767 (S.D.N.Y.1985) (citing *Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976)). Even if it were necessary to join the Met and the Attorney General, the relevant factors in this case would justify an exercise of pendent jurisdiction over the state law claims and thus those claims would survive.

 Since the Met and the Attorney General are not parties whose joinder would deprive the Court of jurisdiction, joinder is *feasible* and the Court need only consider whether joinder should be ordered under Fed.R.Civ.P. 19(a) which provides:

(a) *Persons to be Joined if Feasible.*
A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been

**13.** *See United States v. Licavoli*, 725 F.2d 1040 (6th Cir.), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Malatesta*, 583 F.2d 748 (5th Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Frumento*, 563 F.2d 1083 (3rd Cir.1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1258, 55 L.Ed.2d 776 (1978).

**14.** Defendant argues that since the Rhode Island RICO statute contains the same "chargeable" language, the reasoning of Judge Sweet's opin-

joined, the court shall order that he be made a party. . . .

In this case, under subdivision (a)(1) complete relief may be afforded among the present parties. There is also no problem with non-joinder under subdivision (a)(2). If the only available remedy in Claims VIII and IX were recission of the 1980 trust, joinder of the Met and the Attorney General would be required since the Met's ability to protect its interest would obviously be impaired by an order of this Court eliminating its $2,000,000 remainder interest. However, if recission is not sought as a remedy, joinder need not be ordered and the case may proceed without the Met. Plaintiffs now indicate that they only seek an acceleration of the trust, with the remainder payable to the Met upon the rendering of a judgment adverse to the defendant. With relief crafted in that manner, the Met can only benefit from this litigation and its ability to protect its interests is not implicated. It is thus not a party that need be "joined if feasible."

### (2) *Fed.R.Civ.P. 19(b)*

■ Even assuming it was determined that joinder of the Met and Attorney General is not feasible (i.e., jurisdiction would be destroyed because pendent jurisdiction would not be exercised), and those parties are "necessary" under subdivision (a)(1) or (a)(2), this Court still would have to determine whether they are "indispensable"; in other words, the Court would have to decide under 19(b) whether to dismiss the state law claims in the absence of those parties. Rule 19(b) states:

*Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

This Court has extensive equitable powers to determine whether the Met and the Attorney General are in fact indispensable. That examination must be focused not on the broad question of whether their interests *might* be affected by the outcome of the case, but on the narrower question of whether the case simply cannot proceed without them. As Justice Harlan wrote in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S.Ct. 733, 743, 19 L.Ed.2d 936 (1968):

To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him.

■ Weighing all of the circumstances of this case, this Court holds that the joinder of the Met and the Attorney General is not required even if they were necessary parties whose joinder would destroy jurisdiction. That decision is based upon the fact that there will be no modification of the trust agreement other than acceleration, and this remedy does not impair the charitable remainderman's interest.

Once the type of relief sought is considered, analysis of the factors set forth in Rule 19(b) is straightforward. With relief limited to acceleration, neither the Met nor the Attorney General would suffer prejudice by non-joinder (factor 1). Indeed, if acceleration were ordered, the Met would benefit by early receipt of the trust corpus. Thus, prejudice can be avoided by "the shaping of relief" (factor 2), and such a judgment would be "adequate" in that no party not before the court would be adversely affected (factor 3).

To dismiss the action and relegate plaintiffs to state court to pursue their state law claims while they must proceed in this Court on their federal RICO claim would unfairly prejudice them. Finally, it should be pointed out that the defendant is not prejudiced by the non-joinder of the Met. This is not a case where the outcome in the

---

ion should govern. The Court agrees that the statutes should be treated together in this context and therefore holds that *Louie* is inapplicable to the Rhode Island statute as well.

absence of a party will subject defendant to a multiplicity of litigation.

�

▀▀ Courts should try, where possible, to avoid dismissal based on the failure to join indispensable parties. *Mallis v. FDIC*, 407 F.Supp. 7 (S.D.N.Y.1975), *aff'd in part, rev'd in part on other grounds*, 568 F.2d 824 (2d Cir.1977), *cert. dismissed sub nom. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). Numerous courts have accomplished this result through the "shaping of relief." *E.g., Gertner v. Hospital Affiliates International, Inc.*, 602 F.2d 685 (5th Cir.1979); *Kaye v. Pantone, Inc.*, 78 F.R.D. 657 (S.D. N.Y.1978). Here, the plaintiffs themselves have shaped the relief sought by disclaiming any request for recission of the trust. Accordingly, that part of defendant's motion seeking dismissal of the state claims under Fed.R.Civ.P. 19 is denied.

## IV. *Conclusion*

Defendant's motion to dismiss is denied in its entirety with one exception: plaintiffs' individual claims under the New York Mental Hygiene Law are dismissed. The parties are directed to appear for a conference at 10:00 a.m. on May 9, 1986 to establish a schedule for discovery.

So Ordered.

## On Motion For Limited Reargument

▀▀ Defendant has moved for a limited reargument of his motion to dismiss the complaint. Specifically, he seeks to reargue the question of plaintiffs' standing to bring this action as "next friends". Defendant does not advance any basis for rearguing the issue before this Court, but rather urges that the Court's opinion of May 5, 1986, (familiarity with which is assumed), be modified to certify the question to the Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 1292(b). That section permits certification of an order to the Court of Appeals where such order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The Court declines to certify the question of plaintiffs standing for several reasons. First, in this time of crowded appellate dockets there is a strong public interest in avoiding unnecessary piecemeal litigation. Thus, not every question of law that disposes of a particular litigation is a "controlling question" as that term has been interpreted by the Second Circuit Court of Appeals and the courts in this District. The phrase "controlling question of law" is not equivalent merely to a question of law which is determinative of the case at hand. Instead, the question should contribute to the termination, at an early stage, of a wide spectrum of cases. *Brown v. Bullock*, 294 F.2d 415, 417 (2d Cir.1961); *Kohn v. Royall, Koegel & Wells*, 59 F.R.D. 515, 525 (S.D.N.Y.1973) *appeal dismissed*, 496 F.2d 1094 (2d Cir.1974); *see also Abortion Rights Mobilization Inc. v. Regan*, 552 F.Supp. 364, 366 (1982).

In this case the factual circumstances leading to the Court's order that plaintiffs may sue as "next friends" are unique. Thus, it cannot be said that a review of the order would have "precedential value in a large number of other suits." *Brown*, 294 F.2d at 417. The question is not, as defendant argues, whether the plaintiffs may sue as next friends where a committee for the incompetent has decided not to bring the action. It is the much narrower question of whether plaintiffs may sue where the committee, while declining to sue itself, has expressly approved of plaintiffs' action as in the best interest of the incompetent and where suit by the committee would place it in conflict with the incompetent. To the Court's knowledge, this narrow question has not been presented in any previous case, nor is it likely to recur often.

Secondly, there is no "substantial grounds for difference of opinion" since there is no conflicting authority on this narrow issue. *See Federal Deposit Insurance Corp. v. First National Bank of Waukeshau*, 604 F.Supp. 616 (E.D.Wis. 1985). Indeed, there is no authority on it at all.

Thirdly and most significant, the order of this Court holding that plaintiffs have standing to sue as "next friends" is not a pure "question of law" such as would warrant certification if the other requisites of 28 U.S.C. § 1292(b) were met. Rather, the

order is the result of an exercise of the Court's discretionary power to protect the interests of an incompetent by appointing a guardian *ad litem*, notwithstanding the existence of a committee. *See von Bulow v. von Bulow*, 85 Civ. 5553 (JMW), slip op. at 7–11 (S.D.N.Y. May 5, 1986) (discussion of Court's discretionary power under both federal and New York State law).

Accordingly, defendant's motion for certification is denied.